**THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Billy Wayne Herndon, Employee, Claimant, Appellant-Respondent,

v.

G & G Logging, Inc., Employer, and Palmetto Timber S.I. Fund c/o Walker, Hunter & Associates, Inc., Carrier, Respondents-Appellants.

Appellate Case No. 2017-000692

Appeal From The Workers' Compensation Commission

Unpublished Opinion No. 2019-UP-305
Heard May 16, 2019 – Filed August 21, 2019

**REVERSED AND REMANDED IN PART, AFFIRMED IN PART, AND AFFIRMED AS MODIFIED IN PART.**

Andrea Culler Roche, of Mickle & Bass, LLC, of Columbia, for Appellant-Respondent.

Brian Gallagher O'Keefe, Helen F. Hiser, and Jonathan Gregory Lane, all of McAngus Goudelock & Courie, LLC, of Mount Pleasant, for Respondents-Appellants.

**PER CURIAM:**  Billy Herndon (Claimant) appeals the order of the South Carolina Workers' Compensation Full Commission, arguing the Full Commission erred in finding (1) exceptional reasons existed to deviate from the standard wage calculation and (2) his former employer, G&G Logging, Inc., and its workers' compensation carrier, Palmetto Timber Self Insurance Fund (collectively Employers), were entitled to a credit for overpayment of temporary total disability (TTD) benefits. Employers also appeal the order of the Full Commission, arguing the Full Commission erred in (1) assigning greater weight to Claimant's medical expert's findings than the findings of their medical expert for arbitrary reasons, (2) awarding Claimant total and permanent disability under section 42-9-10 of the South Carolina Code (2015)[1] because Claimant failed to prove he injured a second body part, and (3) finding Claimant proved he was entitled to total and permanent disability because the award was based on a flawed hypothetical and the erroneous premise that any person who cannot work an eight-hour day and forty-hour week is totally and permanently disabled.  We reverse and remand in part, affirm in part, and affirm as modified in part.

## I.  FACTS

Claimant worked as a log truck driver for Bottle Logging for twenty years.  After retiring in 2012, Claimant went back to work part-time for Bottle Logging.  In early 2014, Claimant went to work for G&G Logging, and on May 12, 2014, Claimant was involved in a work-related accident while driving a logging truck for G&G Logging.

Following the accident, Claimant sought treatment from his family doctor, Dr. Bryan Tompkins.  Dr. Tompkins noted Claimant presented with left upper arm pain and elbow pain.  Claimant returned to Dr. Tompkins for a follow up for his "left neck/left shoulder pain," and Dr. Tompkins noted Claimant continued to have issues with his left neck and shoulder, including swelling, numbness, and tingling.  Dr. Tompkins recommended an MRI of Claimant's cervical spine.

About a month later, Claimant went to the emergency room, and the doctors ordered an MRI of Claimant's neck due to Claimant's complaint of "neck pain with tingling down the arm."  The MRI showed "significant disc degeneration at multiple levels." Claimant then returned to Dr. Tompkins, who noted the MRI showed "that [Claimant's cervical] spine issues may be the source of his pain" and that he had

---

[1] Section 42-9-10(B) provides, "The loss of both hands, arms, shoulders, feet, legs, hips, or vision in both eyes, or any two thereof, constitutes total and permanent disability . . . ."

"multiple disk osteophyte complexes from C3/C4[2] through C6/C7, left greater than right." Claimant saw Dr. Tompkins several more times for his left neck and left upper extremity (shoulder, arm, and hand) pain, and Dr. Tompkins noted Claimant continued to have pain and experienced weakness in his left upper extremity. Dr. Tompkins diagnosed Claimant with neck pain and left upper extremity radiculopathy.[3]

Claimant also saw Dr. Artur Pacult of Neurosurgery and Spine Specialists of Charleston; Dr. Pacult diagnosed Claimant with "[c]ervical radiculopathy at C7," and he recommended surgery. Claimant underwent surgery on his C6-7 vertebrae, and he returned to Dr. Pacult for a post-operation check-up. Dr. Pacult noted Claimant's pain and numbness had "markedly improved." Dr. Pacult also noted he believed Claimant would be able to return to work in a few weeks. On April 27, 2015, Dr. Pacult stated Claimant had reached maximum medical improvement (MMI). Dr. Pacult indicated Claimant still stated he could not return to work due to persistent pain but noted there were "[n]o objective findings" of Claimant's pain. Dr. Pacult referred Claimant to an impairment rating specialist.

Employers deposed Dr. Pacult. Dr. Pacult testified following surgery, Claimant's pain and the numbness in his left arm and hand improved. More specifically, he testified Claimant had a normal neurological examination, meaning while he may have some lingering pain, he did not have paralysis, numbness, or weakness in his left arm. He explained Claimant's claims of lingering pain were "subjective," and he believed Claimant could have returned to work in a few weeks' time. Dr. Pacult also testified Claimant "did not have an injury to his left arm, no, to the extremity itself, no," but he explained based on Claimant's pain description, he believed or assumed Claimant had radiculopathy or pain symptoms in his left arm. On cross-examination, Claimant's attorney asked Dr. Pacult:

---

[2] The cervical spine refers to the neck, and it is made of seven vertebrae, which are numbered C1 to C7. *Anatomy of the Spine*, Mayfield Brain and Spine, https://mayfieldclinic.com/pe-anatspine.htm (last visited April 18, 2019).

[3] "Cervical radiculopathy is the clinical description of when a nerve root in the cervical spine becomes inflamed or damaged, resulting in a change in neurological function. Neurological deficits, such as numbness, altered reflexes, or weakness, may radiate anywhere from the neck into the shoulder, arm, hand, or fingers." *What is Cervical Radiculopathy?*, SPINE-health, https://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy (last visited April 18, 2019).

if there's a greater risk of further injury to [Claimant's] back by going back to work in the logging [business] . . . if he came back in today and said, you know, "Going out in the logging woods, I bounce around all the time. I don't want to do further damage to my back," would you recommend to him, "Well, you need to go back to work" or "You need to go back to work as a log truck driver."

Dr. Pacult replied he would not. However, he also stated if he was asked to say "in a reasonable medical degree of certainty," driving a "log truck over a rough road" would cause further injuries to someone with Claimant's injuries, he "would say no."

On June 11, 2015, Claimant went to Dr. James Gee in Sumter for an impairment rating. Dr. Gee noted Claimant had been diagnosed with radiculopathy and his cervical spine was injured. After confirming Claimant reached MMI on April 27, 2015, Dr. Gee assigned Claimant a nine percent medical impairment rating to the whole person, and he opined Claimant could return to work with restrictions on heavy work and stairs and stated Claimant would not need any future medical care for his injury. Although Dr. Gee noted Claimant's pain had improved, he did state Claimant still experiences an "aching pain" in his cervical spine with some of the pain spreading to the back of his head and his left shoulder muscles.

On June 30, 2015, Claimant went to see Dr. Donald Johnson from Southeastern Spine Institute in Mount Pleasant to obtain a second impairment rating. Dr. Johnson noted Claimant "complain[ed] of neck pain with radiating pain, parestesias and numbness down the left arm to the left hand," and even after surgery, he "continues to have symptoms more neck than arm pain." Dr. Johnson found Claimant had a limited range of motion; numbness in a C5-6 distribution; and symptoms in his index finger, forefinger, and along the muscle in his left forearm. Dr. Johnson recommended Claimant update his MRI prior to closing the case, and Dr. Johnson believed Claimant should continue seeing a doctor for possible further treatment. Dr. Johnson assigned Claimant a twenty-six percent impairment rating to the whole person, noting Claimant had decreased use of his left arm due to "radiculopathy with residual numbness and weakness of the left arm and hand." Dr. Johnson also stated if Claimant returned to work as a log truck driver, he believed, "it is inevitable that [Claimant] will injure a disc above his cervical fusion. Work restrictions of avoiding heavy lifting and strain are impossible in the line of work [Claimant] is currently employed by." Dr. Johnson stated work restrictions would include "no work from shoulder level [or] above with limited extension of his neck and no lifting from shoulder level to above greater than 15 to 20 pounds."

Claimant obtained a vocational assessment from Dixon Pearsall. Pearsall stated for an employee to work in a full-time competitive setting, the employee must be able to work eight hours a day and forty hours a week. Pearsall noted Claimant was sixty-five years old; had been a truck driver for over thirty years; had experience as a construction trades worker; had completed the tenth grade; was a former member of the South Carolina National Guard; had "[n]o additional formal education or training"; and could read, write, and do basic math. Pearsall explained Claimant told him he experienced daily neck, shoulder, and arm pain; he had multiple other medical issues. Pearsall noted older people "have increased difficulty obtaining and/or maintaining employment." After reviewing Claimant's medical records, Pearsall found Claimant could "not meet the basic expectations and requirements of competitive employment" and "in consideration of age (65) and prior work experiences, and incorporating the absence of readily transferable skills to 'Light' or Sedentary' work[,] it is 'highly likely' and 'probable' that [Claimant] will not return to competitive employment," including commercial driving. Pearsall likewise found it was "'highly likely' and 'very probable' that [Claimant] will not return to gainful employment in any capacity," including both full and part-time employment.

Employers obtained a vocational assessment from George Page.[4] Page found there were light and sedentary jobs Claimant could do. Page noted Claimant informed him he was retired, he could only make up to $15,000 a year, he would only "work until he reached the $15,000 and not work the rest of the year," and G&G Logging was aware of this; Page stated the jobs he provided as possible occupations for Claimant "fit within [his] criteria of making no more than $15,000 per year due to his Social Security income." Page also believed Claimant's age would not affect his ability to get a job.

Claimant filed a Form 50, alleging injury to "both shoulders, neck, back, chest, [and] left hand" arising out of the accident on May 12, 2014. Employers filed a Form 51 admitting Claimant was injured in a work related accident but denying the nature and extent of Claimant's injuries and disabilities. Employers also filed a Form 20 based on Claimant's wages from January 18, 2014, to May 9, 2014, with a resulting average weekly wage (AWW) of $695 and a compensation rate of $463.36. Claimant later filed an amended Form 50, alleging he had also injured his left upper extremity (arm, shoulder, and hand). In response, Employers filed a second Form

---

[4] Page also testified at the hearing before the Single Commissioner, and his testimony reflects the findings and information in his vocational assessment.

51 admitting Claimant was injured in a work related accident but again denying the nature and extent of Claimant's injuries and disabilities.

Prior to the hearing by the Single Commissioner, Employers filed a Form 58, pre-hearing brief. Amongst other issues, Employers sought a determination of whether they were entitled to credit for overpayment of TTD benefits paid to Claimant after he reached MMI. Employers then filed an amended Form 58 and attached a memorandum of law in which they also sought a recalculation of Claimant's AWW based on evidence that Claimant only planned to work up to the Social Security earnings threshold.

At the hearing before the Single Commissioner, Claimant testified he continued to work part-time for Bottle Logging after retiring because he did not have enough money to get by, he received Social Security benefits while working part-time for Bottle, and he was aware there was a limit on how much money he could earn before his Social Security benefits were reduced. Claimant testified he was not aware what the limit on his earnings was, but he admitted he could have told Page it was $15,000. Claimant stated he earned $7,780 from Bottle Logging in 2012 and $8,806.50 from Bottle Logging in 2013. Claimant clarified he did not limit the amount of work he took from Bottle, he just worked when someone needed him to work, and he had no plan to not exceed the $15,000 threshold. In 2014, Claimant explained he went to work for G&G Logging, where he worked for thirteen weeks earning $9,285. Claimant admitted it "was [his] intention in 2014 then to earn as much as [he] could without reducing [his] retirement benefits." However, he stated he spoke to his supervisor at G&G Logging about what he could make and what would happen if he reached the Social Security earnings threshold, and they decided to "make that decision when [they] got to that point." Claimant explained since the accident, he had neck pain and tingling and numbness in his left arm and hand. He stated no doctor had given him standing, walking, or sitting restrictions, and he was only supposed to limit his bending, stooping, and squatting. However, he described his work with G&G Logging required a lot of lifting—sometimes heavy lifting—as well as walking, standing, sitting, bending, stooping, squatting, climbing, pushing, pulling, twisting, and turning.

In its order, the Single Commissioner found (1) Claimant sustained an admitted injury to his neck during the May 12, 2014 accident, which arose out of the course of his employment; (2) Claimant's left shoulder, left arm, and left hand and fingers were also injured related to the work incident; (3) Claimant was totally and permanently disabled under section 49-2-10(B); and (4) Claimant was entitled to an AWW of $695 with a corresponding compensation rate of $463.33 as calculated on the Form 20 filed by Employers. The order also stated the Single Commissioner

gave greater weight to the findings of Dr. Johnson, Claimant's impairment rating specialist, than Dr. Gee, Employers' impairment rating specialist, because Dr. Johnson's records were more current in time and there was no reason for Claimant to be rated by Dr. Gee in Sumter when all of his other treatment was received in the Walterboro/Charleston area. Employers appealed the Single Commissioner's order to the Full Commission, arguing the Single Commissioner erred in (1) calculating the AWW, (2) finding Claimant was totally and permanently disabled pursuant to section 49-2-10(B), and (3) giving greater weight to Dr. Johnson's findings rather than Dr. Gee's based on arbitrary distinctions.

After a hearing, an Appellate Panel of the Full Commission affirmed in part and reversed in part the Single Commissioner's order. The panel found "exceptional reasons exist[ed] in this claim which require[d] recalculation of Claimant's [AWW] to obtain a result that is fair," because Claimant testified it was his intention in 2014 to limit his earnings to the Social Security earnings threshold to avoid having his retirement benefits decreased. The panel recalculated Claimant's AWW to be $297.63 with a compensation rate of $198.47; it also found Employers were entitled to a credit for the overpaid weekly compensation they paid Claimant in the amount of $36,527.82. The panel affirmed the findings of the Single Commissioner as to (1) Claimant's admitted neck injury and "additional causally related injuries to his left shoulder, left arm, and left hand, and fingers"; (2) giving more weight to the findings of Dr. Johnson rather than Dr. Gee; and (3) finding Claimant was totally and permanently disabled pursuant to section 49-2-10(B). In particular, the panel gave Dr. Johnson's findings more credit because his medical records were more current than Dr. Gee's and because "there was no reason for Claimant to be treated by Dr. Gee in Sumter, South Carolina when all of Claimant's medical treatment was provided in the Walterboro/Charleston area." Additionally, the panel stated it based its findings of total and permanent disability on Claimant's testimony, which it found credible; claimant's wife's testimony; and "the evidence as a whole." They also noted Claimant's and his wife's testimony "corroborate[d] the medical and vocational evidence." This cross appeal followed.

## II. STANDARD OF REVIEW

"The South Carolina Administrative Procedures Act (APA) establishes the standard for judicial review of decisions of the Workers' Compensation Commission." *Bass v. Isochem*, 365 S.C. 454, 467, 617 S.E.2d 369, 376 (Ct. App. 2005). "The substantial evidence rule of the APA governs the standard of review in a Workers' Compensation decision." *Id*. "Pursuant to the APA, this Court's review is limited to deciding whether the Appellate Panel's decision is unsupported by substantial evidence or is controlled by some error of law." *Id*. "A reviewing court may reverse

or modify a decision of an agency if the findings, inferences, conclusions, or decisions of that agency are 'clearly erroneous in view of the reliable, probative and substantial evidence on the whole record.'" *Id.* (quoting *Bursey v. S.C. Dep't of Health & Envtl. Control*, 360 S.C. 135, 143–44, 600 S.E.2d 80, 85 (Ct. App. 2004)).

"Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action." *Id.* at 468, 617 S.E.2d at 376. "Where there are conflicts in the evidence over a factual issue, the findings of the Appellate Panel are conclusive." *Id.* at 468, 617 S.E.2d at 376–77. However, "[w]orkers' compensation awards must not be based on surmise, conjecture or speculation." *Tiller v. Nat'l Health Care Ctr. of Sumter*, 334 S.C. 333, 339, 513 S.E.2d 843, 845 (1999).

## III.  CLAIMANT'S APPEAL

### A. Deviation from the Standard Wage Calculation

Claimant argues the Full Commission erred in finding he was going to stop working when he reached the Social Security earnings threshold because the finding was based on surmise, speculation, and conjecture.  We agree.

> "Average weekly wages" means the earnings of the injured employee in the employment in which he was working at the time of the injury during the period of fifty-two weeks immediately preceding the date of the injury . . . . "Average weekly wage" must be calculated by taking the total wages paid for the last four quarters immediately preceding the quarter in which the injury occurred as reported on the Department of Employment and Workforce's Employer Contribution Reports divided by fifty-two or by the actual number of weeks for which wages were paid, whichever is less. When the employment, prior to the injury, extended over a period of less than fifty-two weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed, as long as results fair and just to both parties will be obtained. . . . *When for exceptional reasons the foregoing would be unfair, either to the employer or*

*employee*, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.

S.C. Code Ann. § 42-1-40 (2015) (emphasis added). Determining whether an exceptional reason exists "for purposes of applying the standard wage calculation method provided by the Workers' Compensation Act is a question of law." *Elliott v. S.C. Dep't of Transp.*, 362 S.C. 234, 237, 607 S.E.2d 90, 92 (Ct. App. 2004). However, the Commission has "broad discretion in determining that exceptional circumstances existed," because "[section 42-1-40] provides an elasticity or flexibility with a view toward always achieving the ultimate objective of reflecting fairly a claimant's probable future earning loss." *Forrest v. A.S. Price Mech.*, 373 S.C. 303, 309, 644 S.E.2d 784, 787 (Ct. App. 2007) (alteration in original) (quoting *Sellers v. Pinedale Residential Ctr.*, 350 S.C. 183, 191, 564 S.E.2d 694, 698 (Ct. App. 2002)). "Moreover, it is well established that the objective of wage calculation is to arrive at a fair approximation of the claimant's probable future earning capacity." *Id.* at 309–10, 644 S.E.2d at 787 (quoting *Elliott*, 362 S.C. at 238, 607 S.E.2d at 92). "Disability reaches into the future, not the past; loss as a result of the injury must be thought of in terms of its impact on probable future earnings." *Id.* at 310, 644 S.E.2d at 787 (quoting *Elliott*, 362 S.C. at 238, 607 S.E.2d at 92).

Here, the Full Commission found Claimant's testimony credible, and he testified (1) he did not limit the amount of work he took from Bottle, working when they needed him; (2) he had no plan to not exceed the Social Security earnings threshold when he worked for Bottle; (3) it "was [his] intention in 2014 then to earn as much as [he] could without reducing [his] retirement benefits"; and (4) he spoke to his supervisor at G&G Logging about what he could make and what would happen if he reached the Social Security earnings threshold, and they decided to "make that decision when [they] got to that point." Claimant also argued the Social Security earnings threshold would have changed for him six months after the accident to be above the compensation rate as calculated using the standard wage calculation. Given Claimant's testimony, which indicated he would have continued to work past the Social Security earnings threshold when he was at Bottle and that he may have continued to work past the Social Security earnings threshold at G&G Logging, and the fact the Social Security earnings threshold would have risen for him a few months after the accident, we find it was speculative to find Claimant did not plan to work past a fixed Social Security earnings threshold. *See Tiller*, 334 S.C. at 339, 513 S.E.2d at 845 ("Workers' compensation awards must not be based on surmise, conjecture or speculation."); *see also* § 42-1-40 (providing the standard wage

calculation should be used unless there are exceptional reasons that the standard calculation would be unfair to the employee or the employer); *Forrest*, 373 S.C. at 309–10, 644 S.E.2d at 787 ("[I]t is well established that the objective of wage calculation is to arrive at a fair approximation of the claimant's probable future earning capacity." (quoting *Elliott*, 362 S.C. at 238, 607 S.E.2d at 92)). Accordingly, we reverse the Full Commission's finding that exceptional reasons existed to deviate from the standard wage calculation and its recalculation of Claimant's AWW, and we remand these issues to the Full Commission. On remand, the record may be opened to allow either party to present evidence as to the AWW or that exceptional reasons have arisen since the Full Commission's order to deviate from the standard wage calculation and to recalculate Claimant's AWW.

### B. Credit for Over Payment of TTD Benefits

Because we found the Full Commission erred in finding Claimant's social security benefits constituted exceptional reasons to deviate from the standard wage calculation and in reducing Claimant's AWW from $695.00 with a compensation rate of $463.36 to $297.63 with a compensation rate of $198.47 based on surmise and speculation, we must also find substantial evidence does not support the Commission's grant of a credit of $36,527.82—the amount of the allegedly overpaid weekly compensation Claimant received—to Employers. *See* S.C. Code Ann. § 42-9-210 (2015) ("Any payments made by an employer to an injured employee during the period of his disability, or to his dependents, which by the terms of this title were not due and payable when made may, subject to the approval of the commission, be deducted from the amount to be paid as compensation."); *Brittle v. Raybestos-Manhattan, Inc.*, 241 S.C. 255, 257, 127 S.E.2d 884, 885 (1962) ("The approval of the Commission for such deduction is required by the foregoing section, and its conclusions thereabout are binding on appeal unless there is an absence of competent evidence to support them."). Accordingly, we reverse as to this issue and remand to the Full Commission to determine whether exceptional reasons existed to deviate from the standard wage calculation to reduce Claimant's AWW and whether a credit is due to Employers.

### IV. EMPLOYERS' APPEAL

#### A. Weight Given to Doctor's Findings

Employers argue the Commission erred in giving greater weight to Dr. Johnson's findings than Dr. Gee's findings because the only reasons for doing so were arbitrary.

Specifically, Employers state the only reasons the Commission gave greater weight to Dr. Johnson than Dr. Gee was because (1) Dr. Johnson's records were more current than Dr. Gee's and (2) there was no reason for Claimant to be rated by Dr. Gee in Sumter when Claimant's treatment occurred in Walterboro/Charleston.

We find the Full Commission did not err in giving more credit to the findings of Dr. Johnson than the findings of Dr. Gee. Initially, we agree with Employers' argument that the locations of Dr. Gee's and Dr. Johnson's offices was an arbitrary reason to give more credit to Dr. Johnson because we cannot see how the location of the doctors' offices affects the quality of the doctors' impairment ratings and findings, especially given the fact that Dr. Johnson's and Dr. Gee's offices were similar distances away from where Claimant resides. *See Trimmier v. S.C. Dep't of Labor, Licensing & Regulation*, 405 S.C. 239, 246, 746 S.E.2d 491, 495 (Ct. App. 2013) ("A decision is arbitrary if it is without a rational basis, is based alone on one's will and not upon any course of reasoning and exercise of judgment, is made at pleasure, without adequate determining principles, or is governed by no fixed rules or standards." (quoting *Deese v. S.C. State Bd. of Dentistry*, 286 S.C. 182, 184–85, 332 S.E.2d 539, 541 (Ct. App. 1985))). However, we do not agree with Employers' argument that giving more credit to Dr. Johnson because he saw Claimant three weeks after Dr. Gee, making his medical records more current, is arbitrary. Medical issues and the pain experienced by a patient are subject to change (for the worse or for the better); therefore, we believe relying more heavily on the most current medical records is rational. Thus, because the Full Commission had at least one legitimate reason for relying more heavily on Dr. Johnson's medical findings than Dr. Gee's, we find Employers' substantial rights were not prejudiced by the arbitrary geographical finding, and we affirm the Full Commission's judgment as to the weight of the evidence. *See* S.C. Code Ann. § 1-23-380(5)(f) (Supp. 2018) ("The court may not substitute its judgment for the judgment of the agency as to the weight of the evidence on questions of fact. . . . [However, t]he court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.").

Moreover, we note there was a conflict in the medical evidence in this case with Dr. Gee giving Claimant a nine percent impairment rating to the whole person and Dr. Johnson giving Claimant a twenty-six impairment rating to the whole person. There was also conflict between the doctors as to the state of Claimant's injury and the impairment to his left upper extremity. The Full Commission adopted the Single Commissioner's findings as to this issue, and "[w]here there is a conflict in the

evidence, the [C]ommission's findings of fact are conclusive." *Sharpe v. Case Produce, Inc.*, 336 S.C. 154, 160, 519 S.E.2d 102, 105 (1999); *see Lockridge v. Santens of Am., Inc.*, 344 S.C. 511, 518, 544 S.E.2d 842, 846 (Ct. App. 2001) ("The final determination of witness credibility and the weight to be accorded evidence is reserved to the [F]ull [C]ommission, and it is not the task of the court to weigh the evidence as found by the [C]ommission."). Therefore, we find the Full Commission did not err in giving more weight to Dr. Johnson's findings than Dr. Gee's findings, and accordingly, we affirm as to this issue.

### B. Total and Permanent Disability under Section 42-9-10

Employers argue the Full Commission erred in awarding Claimant total and permanent disability pursuant to section 42-9-10 because he suffered a single injury to his cervical spine, limiting him to recovery under section 42-9-30 of the South Carolina Code (2015).[5] We disagree.

We believe the Full Commission did not err in finding Claimant permanently and totally disabled pursuant to section 42-9-10(B) because (1) South Carolina law provides a claimant is permanently and totally disabled when a single injury to a scheduled member causes an impairment, physical deficiency, or negative effect to another member of the claimant's body and (2) substantial evidence supports a finding that Claimant's admitted cervical spine injury had a disabling effect on Claimant's left upper extremity (shoulder, arm, and hand) because every doctor Claimant saw noted Claimant's continued complaints of both neck and left upper extremity pain and that Claimant's neck injury caused radiating pain down Claimant's left arm. *See* § 42-9-10(B) ("The loss of both hands, arms, shoulders, feet, legs, hips, or vision in both eyes, or any two thereof, constitutes total and permanent disability . . . ."); *Singleton v. Young Lumber Co.*, 236 S.C. 454, 471, 114 S.E.2d 837, 845 (1960) ("Where the injury is confined to the scheduled member, and there is no impairment of any other part of the body because of such injury, the employee is limited to the scheduled compensation."); *id.* ("To obtain compensation in addition to that scheduled for the injured member, claimant must show that some other part of his body is affected."); *Colonna v. Marlboro Park Hosp.*, 404 S.C. 537, 545, 745 S.E.2d 128, 133 (Ct. App. 2013) ("[T]he question of whether [a claimant] is totally and permanently disabled, and thus entitled to recover under section 42-9-10, turns on whether h[is] initial injury had a 'disabling effect' on other parts of h[is] body."); *Bass*, 365 S.C. at 469, 617 S.E.2d at 377 ("It is not within our province

---

[5] Section 42-9-30 provides the disability period and the compensation to be paid for an injury to a scheduled member.

to reverse findings of the Appellate Panel which are supported by substantial evidence."); *see also Wigfall v. Tideland Utils., Inc.*, 354 S.C. 100, 104, 580 S.E.2d 100, 102 (2003) ("The *Singleton* Court intended 'impairment' to encompass a physical deficiency."). Based on the medical evidence in this case, we find Claimant did not suffer a separate, second injury to his left upper extremity; however, his neck (cervical spine) injury negatively affected and impaired his left upper extremity, entitling him to total and permanent disability. Because the Full Commission appeared to find Claimant suffered a second, separate injury to his left upper extremity as a basis for finding Claimant totally and permanently disabled pursuant to section 49-2-10, and we hold Claimant did not suffer a separate injury but, instead, his initial injury had a disabling effect on his left upper extremity entitling him to total and permanent disability under section 49-2-10, we affirm as modified.

### C. Burden of Proof to Show Entitlement to Total and Permanent Disability

Employers argue Claimant did not meet his burden of proving he was entitled to total and permanent disability because the Commission's finding was based on (1) a flawed hypothetical posed to Dr. Pacult in his deposition that was unsupported by the facts and evidence in this case and (2) "the patently erroneous premise" that a person who could not meet Pearsall's "competitive employment" standard, which requires a person be able to work eight-hour days and forty-hour weeks, is totally and permanently disabled. We disagree.

First, we do not agree with Employers' argument the Full Commission's finding of total and permanent disability was based on a flawed hypothetical that was unsupported by evidence in the case because the facts in the hypothetical question posed to Dr. Pacult were supported by some of the evidence in this case. *See Chapman v. Foremost Dairies, Inc.*, 249 S.C. 438, 449, 154 S.E.2d 845, 851 (1967) ("[I]t is well settled that the probative value of expert testimony, based upon hypothetical facts, stands or falls on the existence or nonexistence of the facts upon which it is predicated."). During his deposition, Claimant asked Dr. Pacult:

> if there is a greater risk of further injury on his back by going back to work in the logging [business] . . . if he came back in today and said, you know, "Going out in the logging woods, I bounce around all the time. I don't want to do further damage to my back," would you recommend to him, "Well, you need to go back to work" or "You need to go back to work as a log truck driver."

Dr. Pacult replied he would not. Although Dr. Pacult testified he did not believe to a reasonable degree of medical certainty that driving a logging truck would cause further injury to Claimant, Dr. Johnson stated in his report if Claimant returned to work as a log truck driver, he believed, "it is inevitable that [Claimant] will injure a disc above his cervical fusion. Work restrictions of avoiding heavy lifting and strain are impossible in the line of work [Claimant] is currently employed in." Furthermore, Claimant, who the Single Commissioner and the Full Commission found credible, testified as to the how he would bounce around in the logging truck, as well as the strain and heavy lifting involved in being a log truck driver. Thus, although there was a conflict in the evidence about the existence of the facts in the hypothetical question, we believe Dr. Johnson's findings and Claimant's testimony are evidence of the existence of the facts in the hypothetical question posed to Dr. Pacult. Therefore, the Full Commission did not err in using Dr. Pacult's answer to this hypothetical question in reaching its decision.

Second, we do not agree with Employers' argument the Full Commission's finding of permanent and total disability was based on the erroneous premise that a person who cannot work eight hours a day and forty hours a week is totally and permanently disabled. While the Full Commission noted Pearsall did not believe Claimant would be able to meet the requirements of "competitive employment," it stated it based its finding on the "evidence as a whole." Thus, the evidence also included Pearsall's finding that Claimant was "highly likely" to not find full-time *or part-time work*. Thus, the Full Commission did not base its finding of total and permanent disability only on the premise that Claimant could not fulfil "competitive employment" requirements but also on the premise that he would not be able to find any work, including part-time positions.

Finally, we note Employers appear to argue the Full Commission based its finding that Claimant proved he was totally and permanently disabled only on (1) the hypothetical asked to Dr. Pacult and (2) Pearsall's finding that Claimant could not meet the requirements of competitive employment. However, the Full Commission noted it based its finding on Claimant's testimony, which it and the Single Commissioner found credible; Claimant's wife's testimony; and "the evidence as a whole." In particular, the Full Commission noted Claimant's and his wife's testimony "corroborate[d] the medical and vocational evidence." Therefore, even if the Full Commission had erred in basing its decision in part on either the hypothetical or Pearsall's findings, we find the Full Commission had other substantial evidence to support its finding that Claimant proved his entitlement to total and permanent disability. *See Bass*, 365 S.C. 469, 617 S.E.2d at 377 ("It is not

within our province to reverse findings of the Appellate Panel which are supported by substantial evidence."). Accordingly, we affirm as to this issue.

## V. CONCLUSION

Accordingly, we reverse the Full Commission's (1) finding that exceptional reasons existed to deviate from the standard wage calculation, (2) recalculation of Claimant's AWW and corresponding compensation rate, and (3) grant of a credit for overpaid TTD benefits to Employers; we remand these issues to the Full Commission to determine whether there were exceptional reasons to deviate from the standard wage calculation, to calculate the proper amount of Claimant's AWW, and to determine if Employers are entitled to a credit for overpaid TTD benefits. We affirm the Full Commission's findings that (1) Dr. Johnson's medical findings were entitled to greater weight than Dr. Gee's and (2) Claimant met his burden of proof to show he was totally and permanently disabled. Finally, we affirm as modified the Full Commission's finding that Claimant was entitled to total and permanent disability pursuant to section 49-2-10.

**REVERSED AND REMANDED IN PART, AFFIRMED IN PART, AND AFFIRMED AS MODIFIED IN PART.**

**WILLIAMS, GEATHERS, and HILL, JJ., concur.**